May it please the Court. My name is Roger Mandell, and along with my co-counsel, Martin Woodward, I represent Appellants Sola and Vesith, two consumer customers of Washington Mutual. These consumers briefed three major issues. However, due to time constraints, I intend to address only one of them today. Specifically, I will argue that the trial court erred in dismissing the consumers' causes of action under TILA, as they relate to Washington Mutual's ATM and debit cards subject to the overdraft limit program. The consumers sufficiently pled that those cards constitute credit cards under TILA and Regulation Z, and that Washington Mutual violated four requirements of TILA and Regulation Z relating to those credit cards, two disclosure requirements and two substantive requirements. Before I begin that argument, I'd like to provide you with a little historical context. Banks traditionally reviewed and decided whether to pay insufficient funds items on an individual basis, paying some and not paying others. In other words, banks occasionally paid inadvertent overdrafts on an ad hoc basis. Washington Mutual's overdraft limit program is a revolutionary new product that is radically different from this traditional practice. Washington Mutual represents that it will, and it does in fact, pay each and every overdraft item up to a preset credit limit, including overdrafts created by ATM and debit cards. Now, with that context in mind, I'd like to turn to the first part of my argument, that Washington Mutual's ATM and debit cards under its overdraft limit program constitute credit cards under TILA and Regulation Z. Now, in its order, the district court did not directly address this issue. It simply, it seemed to assume that they were credit cards and went on to hold that two of the disclosure requirements had not been violated by Washington Mutual. And if, is it appears, the district court assumed that these cards constitute credit cards, it was correct in that assumption. I start with the proposition that Washington Mutual's payment of overdrafts constitute the extension of credit. TILA and Regulation Z define credit as, and I quote, the right to defer payment of debt or to incur debt and defer its payment. I was going to ask you about that regulation. I guess that's 12 CFR 226.2? Yes, 226.2A14. Okay, so how is the payment on an overdraft, how is that a debt, how is that an agreement to defer payment of debt? Well, Your Honor, there's, as we know, there's no way that at the exact simultaneous time that the overdraft is paid that a covering deposit is going to be made. So Washington Mutual understands and agrees that for some period of time it will have paid out its money and expects at a future date to be repaid. And that is the incurring of debt and the deferment of payment. But the consumer isn't, when the consumer writes a bad check, is the consumer incurring debt? Isn't the meaning of this regulation? Well, when It's not like a normal setting where a consumer makes a decision, I'm going to buy this bed or this car and I don't have enough money for it. I want to borrow money to do it. Instead the consumer is writing a check that doesn't have funds in their account to cover it. So is that, is the consumer in that case incurring debt? I mean, I know they're liable to cover the check. Absolutely, Your Honor, because when the bank pays its funds to pay the insufficient funds item with an ATM or a debit card, it is now owed that money by the customer. So the customer owes money to Washington Mutual, which is the debt. So Washington Mutual allowed the customer to incur debt and to defer the payment. Because under the circumstances, Washington Mutual reasonably expects that it will be some reasonable period of time, perhaps days, perhaps weeks, before it's repaid by a covering deposit. But they're not, well, I don't know, are they agreeing to defer payment? Or is it they're, or are they immediately owed it to cover the bad check? Well, Your Honor, as I said, they can't, there's no way they can reasonably expect that instantaneously when they pay the overdraft if there's going to be a covering deposit. But I'm not, I'm not asking about what they could reasonably expect. But maybe they can't expect reasonably that some time won't pass before they're repaid. But it's, at least it's factually unlike the situation where someone borrows money and they know they're owed for a period of time, and then they're going to repay what they borrowed plus interest. So here, I'm asking legally, does Washington Mutual have the right to recover that NSF payment amount immediately? Let's say they found another account at Washington Mutual. Could they pay themselves immediately? Your Honor, there's nothing in the record that indicates that they could go to another account to offset this. The only written materials we have in the record are their promotional materials. And those promotional materials indeed promote the use of overdrafts as a form of credit. They say, don't worry, if you don't have sufficient funds in your account, you're covered. And they're actually promoting it as a short-term form of credit in their promotional materials. And their expectation is that indeed people are aware of this now. It's not something that's undisclosed. It's something they've promoted. And they're aware that people will indeed, may consciously decide to use credit by writing an insufficient funds check or using their ATM or debit card and expecting to repay that within a short period of time. And crucially, that falls exactly within the definition of credit in Regulation Z. I'd also point out that the Office of the Comptroller of the Currency in its interpretive letter number 914 from August 2001 said this, and I quote, an overdraft would be credit as defined by the Truth in Lending Act and Regulation Z, close quote. So the OCC agrees with us on this point. Now, given that there's an extension of credit when the overdrafts are paid, it becomes clear under TILA and Regulation Z that these ATM and debit cards constitute credit cards. TILA and Regulation Z define a credit card as, and I quote, any card that may be used from time to time to obtain credit. Because they can create overdrafts, which Washington Mutual will pay, the ATM and debit cards may be used from time to time to obtain credit. I think the official staff commentary on Regulation Z, which is entitled The Substantial Deference, really confirms this. The commentary says that a debit card... Pardon me, sir. Let's assume they are credit cards. Your contention is that there was a claim that Washington Mutual issued them when the plaintiffs had not requested them. Is that right? That is one of the two substantive credit card requirements that we contend was violated. Okay. You say that's one of them. Was that alleged in the complaint, this was a dismissal of the complaint, that Washington Mutual had issued the credit cards without the plaintiffs' request? Yes, Your Honor. And you can find that in paragraph 69 of the class action complaint, which you can find in the excerpts of record at page 18. Okay. Page 18 of the ER. That's correct, Your Honor. That's where they alleged that the bank was sending these cards out without having been asked for them. That's correct, Your Honor. And... Now, you also seem to take the position that the bank did not have the permission or any agreement with the cardholders to offset. I guess that's what you're saying. Does the complaint allege that there was no agreement? Your Honor, the... Yes, Your Honor. I believe that would be in paragraph 70, also found in the excerpts of record at page 18. Certainly, there's no... It said the bank violated the Truth in Lending Act prohibition against credit card issues offsetting cardholders' indebtedness against funds held on deposit in the absence of the affirmative consent. Now, that gives rise to a separate question, but related. On page 4, paragraph 12, there's a statement that said, Don't worry, we'll cover you and automatic protection will pay your checks were and are objectively deceptive and misleading because it would thus misrepresent the legal obligation the bank undertook as a result of the formation of the deposit account contract. Now, I read that as an affirmative statement that there was a contract between the bank and these depositors. Your Honor, I think that what that's referring to is the... In some... There's no allegation there's a formal written deposit contract, but what we're saying is that a contract was in effect formed by their issuance of the written promotional materials in which they agreed to pay overdrafts. So you can have a formation of an unwritten contract. Is that... So you say a formation of the deposit account contract, so the depositor never knows what the bank's saying, never signs a deposit contract, but there was a formation of such a contract. At least by the practice of the parties and perhaps oral and the written promotional materials, there obviously was some sort of contractual relationship, but the important thing is... But was there a written contract? Are you saying there was a written contract or was not a written contract? We are not alleging at this point that there was a formal written contract because there's no evidence of that in the record. We say that there was a written agreement by virtue of the promotional materials to pay overdrafts, and then that governs the terms of the overdraft limit program. But what's important is nowhere in the petition does it allege that any agreement included an agreement that they could offset the checking account with any credit card indebtedness. Now, what you have to remember is that the offset prohibition is the standard rule, and then an offset pursuant to an automatic debit plan agreed to in writing is an exception. And the petitioner... The appellants never pled the exception, and Washington Mutual doesn't really even deny that the offset prohibition is applicable. And the district court didn't ever even address... Well, as a motion, I guess they're stuck with your pleading. And it seems to be big enough that you could probably argue the Declaration of Independence, but there's really no way they could assert anything short of a summary judgment. Isn't that right? Well, as to this, Your Honor, it's an exception to the normal rule. So all we have to do is plead the applicability and the violation of the offset prohibition. And for them to bring up the exception of the written agreement exception, obviously at the pleading stage they could only rely upon that if we had pled the exception, which we did not. And since we pled the applicability of the offset prohibition, we pled its violation, then that's all we have to do at the pleading stage. And the district court was in error in dismissing the sixth cause of action under TILA relating to this. And in fact, the district court didn't even address this issue in its opinion. Now, the same really holds true of the unsolicited credit card issuance argument as well. The consumers pled that Washington Mutual issued unsolicited credit cards in violation of TILA Section 1642 by adding the overdraft credit feature to existing ATM and debit cards and by issuing new cards with that feature. And the district court simply ignored this allegation. Now, Washington Mutual's response is to cite to Regulation E, which in Section 205.12 says that it and not TILA in Regulation Z applies to credit cards which only provide for overdraft credit extensions. But that applies only if the credit extension is pursuant to a preexisting agreement between the consumer and the financial institution. Now, the consumers did attempt to plead such an agreement in connection with their claim that the overdraft charges constitute finance charges under TILA. But the district court held that the consumers had not done so sufficiently. So that puts this in an either-or situation. If the court overrules the district court and agrees with the consumers that they have sufficiently pled such an agreement, then they have not pled a violation of TILA Section 1642. However, if the court affirms the district court and holds the consumers have not sufficiently pled such an agreement, then they have pled a violation of TILA Section 1642. If the $21 charges are finance charges, there's been a violation. Is that correct? Yes, Your Honor. And that really relates to – that doesn't relate to the two substantive requirements of the no unsolicited issuance of cards or the offset. Credit card violations. Those are the substantive credit card violations. Whether the finance – whether these are finance charges as it relates to credit cards would be on the disclosure requirements, whether disclosure requirements related to finance charges do or do not have to be given. But as we'll see, there are also disclosure requirements that apply regardless of whether there's a finance charge. And those have to be given in any instance. And that's why, as we'll see in just a minute, that the district court erred in dismissing the TILA causes of action as to the disclosure requirements. And what we'd like to point about the disclosure requirements is this. There are three separate disclosure – types of disclosures that have to be made, set out in three different sections in TILA and Regulation Z. In one section, they require disclosures in credit and charge card applications. In another section, they require disclosures in initial disclosure statements. And in the third section, they require disclosures in periodic statements. Now, the district court correctly held that the disclosure requirements in applications and solicitations do not apply to Washington Mutuals cards because they only access overdraft lines of credit. However, the district court ignored the other two types of disclosures, the periodic statement disclosures and the initial statement disclosures, which are separate disclosures and which do not contain an exception for credit extensions that are overdraft lines of credit attached to an asset account. And because the district court simply ignored these allegations, it was an error in dismissing the first cause of action under TILA. Now, the initial disclosure statement requirement has eight different disclosures. Four of them relate to finance charges and four of them do not. But if the court finds that the overdraft charges are finance charges, then they violated these disclosures. But even if they didn't, there are still two disclosures that would be important. Number one, the identification of other charges which may be imposed and their method of calculation. And number two, a statement of a customer's billing rights. Those apply even if the overdraft charges are not finance charges. The consumers pled this violation, the district court simply ignored it, and it was an error in doing so. Periodic statements require ten different disclosures. Five relate to finance charges and five do not. So even if the court finds that the overdraft charges are not finance charges, there were still five disclosures that were required to be made. The consumers pled this violation, the district court simply ignored it, and therefore was in error in violating, in dismissing the first cause of action. And with that, I have about three minutes left, and I'd like to reserve the rest for rebuttal. Thank you. Thank you very much. Okay. We thank Mr. Mandel, and we'll now hear from Ms. Strickland. Good morning, Your Honors. Let me begin probably at the beginning. Let me note that the, and this is critical here, the regulatory agencies which have the greatest level of information and the greatest interest in the exact issue before this court have addressed the exact issue before this court. And all of this is before the court, but there was guidance issued. There was a formal process for taking comments on the guidance. The appellants here, in fact, made extensive submissions to those regulatory agencies. And then in February and May of last year, final rules were issued addressing precisely the issue before this court. And what did those regulatory agencies conclude? They concluded that overdraft limit programs, like the program at issue here, are not governed by TILA, not governed by Regulation Z, but rather are subject to the disclosure requirements of TISA, the Truth in Savings Act, Regulation DD. And this really doesn't need to go much beyond that. Don't we have to look at the situation that existed when this cause of action arose? Because that regulation is not effective until I think this summer sometime. Well, Regulation DD goes into effect in 2006. Right. Right, in July of 2006. So we have to look at what happened, what, you know,  And we may get some guidance from the agencies after the fact mumblings about what the law was, but we have to look at did TILA apply at that time as a matter of law? Well, nothing about the Truth in Lending Act has changed as a result of that guidance. What you do have, though, is interpretive instruction from the regulatory bodies that tell you how that statute and how the Truth in Savings Act and how programs like this should be viewed under the applicable laws that they are responsible for administering. So it's not like you have a change in the law, but what you do have is the benefit of the regulators who know more than anyone about these programs and have the greatest interest in these programs telling you how the law that exists is to be interpreted. And so I don't think the timing actually makes a difference here. If they were here arguing that Regulation DD had been violated, for example, then the issue of the timing of when the changes would take effect obviously would be of some relevance. But what I would analogize the situation to is the following. There's a Supreme Court case that's decided construing TILA, that's decided between the time that the lawsuit is brought and we stand here today. That Supreme Court case tells us how TILA is to be interpreted. It doesn't change the law. It just tells you how the statute is to be interpreted. The Supreme Court has a fiction that the law is always there and all they do is reach in once in a while and tell you what it is, but it's always been the same, even if they have to change their view of it. So I don't think the Supreme Court is a very good analogy to mere mortals like us and regulatory agencies that have to do it as we get to it. Well, I would submit that we all have to live with the Supreme Court and that fiction, and that does guide this, but that's a little off point. But my point being is that I don't think it matters. I mean, the fact is you've got regulators. They're the ones who really know these statutes, have a view. They've expressed that view in lurid detail. They've addressed exactly the issues that the plaintiffs here, the appellants here, have argued before this court. All of that was considered, all of it rejected, and the regulators said it's not a TILA issue, it's a TISA issue. Here's the way to deal with it. We're amending TISA. Now, when you say the regulators, you mean the Office of Thrift Supervision? Well, every regulator that would even possibly have an interest in this, the Office of the Comptroller of the Currency addressed it, the Federal Reserve Board, the National Credit Union, the OTS. And who do we have? I know we've got amicus briefs from the OTS. Do we have amicus briefs from any other regulators? We do not. And the OTS's brief, to be fair, did not address the TILA issue, which it was the OTS's position had already been addressed in the proposed rules and the guidance. They addressed the issue of interest under the Homeowners' Law Act. So let me take a moment and respond to some of the points that have been made here. I mean, there's obviously extensive briefing on the very complex regulatory scheme that we're dealing with. Mr. Mandel started his comments by saying that this product is somehow radically different from anything that's been considered before. Well, that just is not the case. The guidance here is very helpful. The guidance talks about overdraft limit programs just like the program before this Court. And the guidance recognizes that, of course, with time, with computerization, with automation, the nature of all of our banking and deposit transactions have changed. But the guidance puts together, lumps together and treats the same what I would call traditional overdrafts of the type that used to exist when I first started, you know, with a checking account, with those that exist now, which are much more automated and computerized. We're sure the distinguished lawyers who argued us have never written a check without sufficient funds. Hopefully not intentionally. But the point is these regulatory bodies have taken into account that times, yes, times have changed. But they've concluded that the historic or traditional overdraft protection programs are really what's been automated now and they are to be treated the same. The distinction they draw, and this is really very important when we get to the next point, which is whether there's been an extension of credit, is the difference between an overdraft program, an overdraft limit program like the type that Washington Mutual is alleged to have, and a line of credit, which is something different, that is a contractual commitment with terms that essentially allows you, not essentially, that fully allows you to borrow money from the bank to cover your checks. And it has a repayment plan. It has terms. It has interest. All of that is addressed in the guidance right up front. And that distinction is the driver here. Going to Mr. Mandel's point, this is not an extension of credit. And that is absolutely clear. And the reason for that is that it's not credit in the first place because there is no right to defer repayment. I believe it was actually Justice School's question about this. Immediate does not give you the right to defer payment. And in the pleadings before this Court, there is an exhibit properly before this Court which is very clear that immediate repayment is required here. That's not the same as a right to defer payment. A right to defer payment. Is the document that says that these will be immediately repaid? It's exhibit C to the complaint. Exhibit what? Exhibit C to the complaint. C as in dog? C. I'm sorry. C as in cat. Okay. And it is the promotional materials on which appellants rely in a footnote, which I will happily read to the Court. A footnote benefited by photocopying and my middle-aged eyes, I might add. But the footnote to the overdraft limit program says, and I quote, subject to overdraft charge and you must bring your account to a positive balance immediately. Under no construction is immediate the same as a right to defer payment. If not, the distinction between the line of credit and an overdraft program, as contemplated in the guidance as well as the case law, would be completely obliterated. I mean, obviously, as appellants point out in their briefs, some time must pass between the overdraft and when you replenish the account. That time may be as little as a minute because when there's an overdraft, you may immediately transfer money into your account. But deferring payment contemplates some sort of written understanding that there is a schedule pursuant to which payment can be made over a period of time. Okay, what if this is not an extension of credit? This whole arrangement is not an extension of credit. They also allege the credit card claim, two aspects of credit card violations, the issuance without request, and that there was this right of the bank to take money from another account to pay off the overdraft. Well, let me start with whether this is a credit card, because you don't get into any of those requirements unless you have a credit card. That's right. And we briefed this issue, but very simply, a credit card is a card that may be used to obtain credit. And this is only a debit card that lets you – Correct. This is a deposit account which has an overdraft limit feature on it. It is not a credit relationship for the reasons that I've articulated as well as those in our brief. It's a debit card that lets you use a debit card that takes money out of your account, and if you use it to take more money out of the account than you've got in the account, that's like writing an NSF check. It's the same thing. Exactly the same thing. And then you need to replenish it right away, immediately. You owe it immediately if you have a debit card. Exactly. In terms of the legal obligation on that. And what's your response to the argument from the appellants that Washington Mutual knows it's not going to be repaid immediately, it's going to take a reasonable time or something like that? Well, that's quite a fascinating argument, because in their own briefs they concede that immediate is the same as a reasonable period of time. That's their position. And I can't remember if they cite Webster's for that, or whether it's just in the nature of opining by the lawyers, but they say what can immediately be other than a reasonable period of time. What would happen if, let's say, Citizen Acts has a, or Person Acts, has an account with this feature, and they use a debit card and they debit $100 that they don't have in their account. So there's a charge for the overdraft, right? Correct. And in addition they owe the $100 which has been paid, I guess, to the company that got this debit slip. Right. Now, if the person takes a week before they cover it, or they cover that $100 and the charge, does interest accrue on that? Interest does not accrue. No, you pay the fee. But I can tell you outside what's in the record what happens in real life. You pay the fee. Apart from the fee, if you take a month to pay it back rather than a week, do you pay more? You lose your debit card privileges and overdraft limit privileges. That's what happens. If you don't pay it back. Right. But they don't charge interest? They would not be charging interest on that. So to the extent that if you view the fee as interest, it's interest that applies no matter whether you pay it back in an hour or pay it back in a month. That's exactly right. Washington Mutual doesn't view it as interest. It's not viewed as interest. It's a processing fee. It is a fee for overdrafting your account, just like the cases, the series of Mississippi cases, which are the only authority before this court in terms of case law, say, which is this is a fee you pay for the bank processing an overdrawn check. Okay. Now, this case was dismissed on the pleadings, right? That's correct. So are these issues that can be resolved at the pleading stage? Are they issues where the district court erred in dismissing a complaint and it should have proceeded to some discovery and summary judgment motion? We believe, obviously, that they can be dismissed at the pleading stage. We believe that everything that the district court needed to decide or needed for its decision was before it, and I think that the district court's opinion makes that clear. The district, without belaboring each point because it's in the record, you know, the district court concluded this wasn't a finance charge. To come to that conclusion, the district court relied on the statements that were before the court as Exhibits A and B to the complaint, which recite that the fee is the same whether an item is paid or returned. The district court relied on plaintiff's own allegations with respect to whether there's an agreement or non-agreement with respect to the covering of overdrawn checks. Again, as well as the statement, which makes clear that the decision of whether to honor or not is one of discretion because, again, paid or returned. That gives the bank the option. So we believe that everything that the court needs to decide this issue is before it. Let me make one – What about the existence of a written agreement, a depository agreement? You and the plaintiffs have talked about promotional materials. There are some vague allegations in the complaint about maybe a depository agreement. Does there have to be a depository agreement for the bank to do what it did? There would not have to be a depository agreement. The promotional materials is enough? To not honor overdrafts? Right. The promotional materials do not constitute a written agreement is our position. Even though they say that they will honor overdrafts? Well, I'm not sure that that's what they say. We could disagree on that. The promotional materials are just that. They're promotional materials. And then you get bank statements that say we don't have to honor them. They say paid or returned. Can you do the promotional materials like as an offer for a unilateral contract so that when you get promotional materials from Washington Mutual and then a consumer opens an account, that in effect they have an agreement? Well, I think that actually is contrary to what plaintiffs themselves allege. I mean, the plaintiffs themselves distinguish, I believe, in paragraphs 12 and 19 in the complaint, but I may have the numbers wrong. I think that's right, between the promotional materials and the contract. They admit that there's a deposit contract. They say that one of the flaws in the promotional materials is that they don't accurately represent what the legal obligation of Washington Mutual is, and that somehow the contract varied that, and it's that allegation in part that the court relied on. So it is our view that there was enough before the court. But I'd like to say one more thing about that, which is two of the issues raised today and in the briefing were not raised by the appellants before the court below, and specifically these are the issues with respect to initial disclosures and periodic statement disclosures. Those were not briefed before the trial court, and as we point out in our papers, they're not properly before this court as a result. Is this a thing that has to do with the dollar in the account? Do you have to send reports or something, or is that another requirement? That's something else. I think what you're thinking of is actually one of the Federal Reserve reports that they cite to. That has to do with the bank's obligation to replenish its own Federal Reserve account, which is an entirely different issue, not properly before this court. I believe my time is up, unless the panel has... I've got some questions here. If we were to agree with you that the $21 charge by the bank for NSF checks is not a finance charge, then there would be no TILA violation by failing to provide information that TILA would require. Is that correct? That's correct. All right. If this is not a credit transaction, the cards that were issued were debit cards, then the fact that the bank may have sent them voluntarily wouldn't make any difference because they weren't sending credit cards. That's correct. Is that right? Now, then that would get us to this offsetting the credit or the amounts in the overdrawn account from other accounts that were at the bank, and apparently the bank has the right to offset. If you're overdrawn in one account, they can use another account and offset. And I think the bank has that right. I think that's not in the record, but the bank surely has that right. Yes, I would think so. Now, is there some failure to report or failure to obey TILA with regard to these offsets? Well, the offset issue only comes up in the event that the transactions are subject to the Truth in Lending Act to begin with, and it's our position that they are not subject to the Truth in Lending Act because they're not credit cards. Okay. All right. Now, then we get down to the – There are other reasons, by the way, that that's also true. Even if they were subject to the Truth in Lending Act, they don't fall within the offsetting accounts provisions. If Your Honor is interested, but it's our position they're not under that act at all. One of my early jobs when I was 18, I used to take the NSF checks in the bank where I was employed up to the officer, and he'd look at them, and he'd decide whether to send them back or not. And if he knew old Bob, he'd just get on the phone and tell him, we're going to pay the check, get in here and clear it. Right. Now, that was what was done more than 50 years ago, but nevertheless, that's the way it used to work. You're saying it still works the same way, aren't you? Well, no, what I'm saying is it doesn't work the same way. There's no question that the process has been automated. What I'm saying, though, is that the regulatory agencies that are responsible for this exact function at banks, you know, the OCC, the Fed, the OTS, all recognize in the guidance that, yes, the process has been modernized. Yes, it's been computerized, but we're going to treat this the same way as it's always been treated. And for the purposes of determining whether there's a finance charge, in fact, it doesn't matter because the written agreement aspect still is the same. There's no written agreement to honor. It doesn't matter whether you have a traditional process or a modern process, but I think the guidance is the touchstone here, and the guidance makes clear that the old-fashioned way and the new-fangled way are the same for the purpose of analyzing the regulations, that the distinction now is really do you have a formal line of credit or do you have an overdraft program? And here we have an overdraft limit. We don't have a line of credit situation because there's no terms for repayment. Does the record contain anything regarding the interests of whether the financial institution has a goodwill or other interest in covering overdrafts? Does it affect Washington Mutual if they don't pay an overdraft? I don't know that there's anything directly in the record on this issue. I think there is some discussion about the potential for customer embarrassment, and that's one of the reasons that overdrafts are covered, to save customers embarrassment and awkwardness. But there's nothing in the record about any kind of institutional reasons for this program, apart from the customers? No, other than the guidance, which I think articulates those issues on an industry-wide basis. Thank you very much. Thank you. Mr. Mandel, you have rebuttal time, and because our questions drew out your colleague, Ms. Strickland, over her time, we will add, what do we have for Mr. Mandel's rebuttal now? About three minutes. Okay, add three minutes, or two minutes to it. I'll go ahead. Give me five minutes, roughly. Thank you, Your Honor. We need a little time because we took Ms. Strickland over, so you don't have to use it, but if you want to, you can. Thank you, Your Honor. Let's start with the fundamental proposition. Obviously, to be credit cards, these ATM and debit cards, when an overdraft is paid pursuant to them, that needs to be the extension of credit by the payment of the overdraft. And the definition is the right to incur debt and defer payment. Now, neither TILA nor Regulation Z nor the official staff commentary puts a minimum length of time on the period of deferral in order for this to be considered the extension of credit. Now, the promotional materials do say repay immediately. Well, in Busey v. The Nevada Construction Company case from 1942, this court said that this court has repeatedly held that when that term is used in a statute or a contract, it means as soon as practicable or within a reasonable period of time. So immediately contemplates some period of time, a reasonable period of time under the circumstances, may be hours, may be days, may be weeks, may even be months, but there's a period of deferment. And that is all the statutory language and the regulation requires on its face. Do they charge for that period of deferment? Well, they charge the overdraft charge, $21. Whether they had paid the check or not, they charge $21 for an NSF check, whether it's paid or not, right? They do have, if you exceed, if you have overdrafts that exceed your credit limit and then they return those checks, then they would charge the $21. Now, we do argue that, of course, that in effect this charge is a finance charge. But regardless of that, there is nothing in any of the definitions of credit card or of credit that says that there has to be an interest charge or a finance charge on that. In fact, you have charge cards, which are defined as allowing the extension of credit without a finance charge. American Express was a classic charge card in the old day, and yet it's subject, it's a credit card for purposes of all these disclosure requirements, even though the contemplation is that it will be paid back every month without the imposition of a finance charge. Now, I think what really makes this clear is that Regulation Z explicitly says that due-on-demand debt, due-on-demand notes are the extension of credit and are covered by TILA. Now, obviously, due-on-demand notes are, in essence, immediately. They can be, with even the most infinitesimal time of deferment, they can be called, yet they are still credit. And I think that's very important. And, of course, they have no response to the Office of the Comptroller of the Currency, which in 2001 said that the payment of overdrafts is the extension of credit under TILA and Regulation Z. Now, let me address the issue of did we brief to the trial court the disclosure requirements. And if you will look later at page 12 of Appellant's Opposition, which can be found in the record excerpts at page 78, we specifically said that we briefed that the disclosure requirements of subpart B of TILA had been alleged and had not been met. And section 1637, which has the periodic statement disclosures and has the initial statement disclosures, is in subpart B of TILA. So, we did bring that up to the district court. Let me conclude by addressing this argument that somehow the adoption of Regulation DD as the governing provision on overdraft limit programs forecloses our credit card argument. Three responses to that. Number one, nowhere in the rule did the Federal Reserve Board address the specific issue of whether ATM and debit cards that systematically allow overdrafts constitute credit cards under TILA. In fact, nothing in the rule indicates that the Federal Reserve Board specifically considered that argument. Second, as we've seen, TILA, Regulation Z, and the official staff commentary to Regulation Z define credit cards so as to include these ATM and debit cards under the overdraft limit program. The board could not conceivably overturn the congressional statute, its own Regulation Z, and its own official staff commentary in its comments relating to another rule and another statute. Third, what the board was deciding in Regulation DD was how to regulate what it considered to be typical overdraft programs. It said that, I see I've only got five seconds. Could I finish this explanation? Thank you. Thank you. What the board said was trying to regulate typical overdraft programs. And it said that in the typical program as it described it, there was an explicit disclaimer of the obligation to pay all overdrafts. So it said because of this, there was no written agreement to pay overdrafts. And it noted that Regulation Z already excluded the payment of overdrafts if there was no written agreement to pay them. So what it was addressing was programs that were not already covered under Regulation Z and not already covered under Regulation DD and deciding how are we going to regulate them. And it decided in under Regulation DD. What it did not address was programs that were already under Regulation Z. That is, if you had an agreement in writing to pay overdrafts, which we alleged, it wasn't touching that and it didn't purport to address if credit cards, if ATM and debit cards already constituted credit cards under TILA, it didn't purport to address that. So in regulating, it was purporting to regulate something other than what plaintiffs have alleged. And for that reason, we don't think that their final guidance forecloses our credit card argument. Thank you. Very good. Well, we thank Mr. Mandel and Ms. Picklin for their spirited, thoughtful, and well-presented arguments. We also will thank Ms. Picklin for her travel from Los Angeles to Pasadena and Mr. Mandel for his longer travel from Texas to Pasadena. But we appreciate the help from each of you, and we will now submit the case. So, SOLA v. Washington Mutual is submitted. We thank you.
judges: Thompson, T. Nelson, Gould